# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| TONEY KELSEY, | : | CIVIL CASE NO. |
| Petitioner, | : | 3:20-CV-00097 (JCH) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | DECEMBER 13, 2023 |
| Respondent. | : | |
| | : | |

## RULING ON AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE (DOC. NO. 30)

## I.      INTRODUCTION

In this habeas case, petitioner Toney Kelsey ("Mr. Kelsey") moves to vacate his sentence pursuant to section 2255 of title 28 of the United States Code.  Mr. Kelsey argues that his trial counsel was ineffective for not investigating the petitioner's competency more thoroughly and not reviewing discovery with Mr. Kelsey.  The alleged ineffectiveness includes failing to secure more records from the Federal Bureau of Prisons (BOP) regarding Mr. Kelsey's commitment and forgoing consultation with Dr. Rocksheng Zhong, a psychiatrist who had previously assessed the petitioner as incompetent to stand trial.

After an evidentiary hearing and review of the record, Mr. Kelsey's Motion (Doc. No. 30) is denied.

## II.    BACKGROUND

On February 22, 2017, Mr. Kelsey was charged with one count of conspiracy to commit sex trafficking of a minor, in violation of section 1594(c) of title 18 of the United States Code, and three counts of sex trafficking of a minor, in violation of sections 1591(a)(1), (b)(2), and (c) of title 18 of the United States Code.  See Indictment (Doc. No. 1), United States v. Kelsey, 17-cr-00036.

On May 22, 2018, Mr. Kelsey was found guilty at trial of one count of conspiracy to commit sex trafficking of a minor and two counts of sex trafficking of a minor, but the jury acquitted him of the third court of sex trafficking of a minor.  See Judgment (Doc. No. 195), United States v. Kelsey, 17-cr-00036; Judgment of Acquittal (Doc. No. 196), United States v. Kelsey, 17-cr-00036.  On January 4, 2019, the court sentenced Mr. Kelsey to 180 months imprisonment on each count, to be served concurrently.  See Judgment at 1.  The court also imposed a five-year term of supervised release, id., and ordered Mr. Kelsey to pay restitution in the amount of $1,850, see Restitution Order (Doc. No. 233), United States v. Kelsey, 17-cr-00036.

Mr. Kelsey appealed the court's judgment, challenging, inter alia, the finding that he was competent to stand trial and the denial of his last-minute request for new counsel.  See United States v. Kelsey, 807 F. App'x 61, 63 (2d Cir. 2020).  On March 31, 2020, the Second Circuit found no clear error in this court's competency determination, which it noted was based on a Report from the U.S. Bureau of Prisons (BOP), "defense counsel's representations, and its own observations of [Mr.] Kelsey." Id. at 64.  The Second Circuit added that "[Mr.] Kelsey's behavior at and after trial and the district court's discussion of Kelsey's mental health at sentencing do not undermine

2

the district court's finding." Id.  Moreover, this court's denial of Mr. Kelsey's request for

new counsel on the first day of trial was also upheld.  Id. at 65.

On January 21, 2020, Mr. Kelsey filed a pro se Motion to Vacate, Set Aside, or

Correct the Sentence pursuant to section 2255 of title 28 of the United States Code.

See Motion to Vacate, Set Aside, or Correct the Sentence (Doc. No. 1).  After present

counsel for Mr. Kelsey was added to the case on February 6, 2020, the instant

Amended Motion was filed, which asserts that Attorneys Bruce D. Koffsky ("Attorney

Koffsky") and Audrey A. Felsen ("Attorney Felsen") provided ineffective assistance by

failing to investigate the BOP's Report and challenge the court's competency finding, as

well as not reviewing evidence with Mr. Kelsey.  See Amended Motion to Vacate, Set

Aside, or Correct the Sentence ("Am. Mot. to Vacate") at 4 (Doc. No. 30); Memorandum

in Support of Amended Motion for Relief ("Pet'r's Mem.") (Doc. No. 39); Reply

Memorandum in Support of Motion for New Trial ("Pet'r's Reply") (Doc. No. 49).  The

Government opposes the Amended Motion, arguing that Mr. Kelsey has established

neither deficient performance nor the requisite prejudice.  See Government's Opposition

to Amended Motion to Vacate, Set Aside, or Correct Sentence ("Gov't's Opp'n") (Doc.

No. 42); Government's Sur-Reply Memorandum in Opposition to Amended Motion to

Vacate, Set Aside, or Correct Sentence ("Gov't's Sur-Reply") (Doc. No. 52).

Additionally, the court held an evidentiary hearing over the course of four days

this year: April 28, May 18, June 14, and July 6.  See Order (ECF No. 57); Notice (ECF

No. 64); Notice (ECF No. 67); Notice (ECF No. 71).  The hearings included testimony

from Attorney Francis L. O'Reilly ("Attorney O'Reilly"); Private Investigator William

Smith; Attorney Koffsky; Alissa Marquez, Ph.D ("Dr. Marquez"); Rocksheng Zhong,

M.D., M.H.S. ("Dr. Zhong"); Attorney Felsen; and Deputy U.S Marshal Matthew Moore.

Following the hearing, the parties submitted supplemental briefing.  <u>See</u> Petitioner's

Post-Hearing Brief in Support of Amended Motion ("Pet'r's Suppl. Brief") (Doc. No. 76);

Government's Post-Hearing Supplemental Memorandum in Opposition to Amended

Motion (Doc. No. 79); Petitioner's Post-Hearing Reply Brief ("Pet'r's Post-Hr'g Reply")

(Doc. No. 82).

**III.   FINDINGS OF FACT**

    A.   <u>Pre-Commitment Proceedings</u>

    At Mr. Kelsey's arraignment on March 7, 2017, he was represented by Assistant

Federal Defender Kelly Barrett ("Attorney Barrett").  <u>See</u> Minute Entry for Initial

Appearance and Arraignment (Doc. No. 9), <u>United States v. Kelsey</u>, 17-cr-00036.

During arraignment, Mr. Kelsey expressed a desire to retain private counsel, and the

court gave him 30 days to do so.  <u>Id.</u>

    When Mr. Kelsey did not retain private counsel within the allotted time, Assistant

Federal Defender Tracy L. Frederick ("Attorney Frederick") became counsel of record

for the Federal Defenders.  <u>See</u> Attorney Appearance (Doc. No. 15), <u>United States v.</u>

<u>Kelsey</u>, 17-cr-00036; Order (ECF No. 17), <u>United States v. Kelsey</u>, 17-cr-00036.  This

attorney-client relationship quickly dissolved, however, and Attorney Frederick moved to

withdraw due to "an irretrievable breakdown in the attorney-client relationship which

makes it impossible for counsel to continue providing effective representation."  Motion

to Withdraw Appearance (Doc. No. 18), <u>United States v. Kelsey</u>, 17-cr-00036.

    After the court granted Attorney Fredericks's Motion, Anthony David Collins

("Attorney Collins") was appointed to the case on April 25, 2017.  Criminal Docket,

<u>United States v. Kelsey</u>, 17-cr-00036.  Attorney Collins' stint as Mr. Kelsey's attorney

was also short-lived, however, as he moved to withdraw his appearance on June 1, 2017.  See Oral Motion (ECF No. 23), United States v. Kelsey, 17-cr-00036.  That same day, the court granted Attorney Collins' Motion, and Attorney O'Reilly was added to the case.  See Minute Entry for June 1, 2017 Hearing (Doc. No. 24), United States v. Kelsey, 17-cr-00036; Criminal Docket, United States v. Kelsey, 17-cr-00036.

A Frye hearing was conducted by then-Magistrate Judge Sarah A. L. Merriam ("Judge Merriam") on July 27, 2017.  See Minute Entry for Frye Hearing (Doc. No. 43), United States v. Kelsey, 17-cr-00036.  The Frye hearing began with Judge Merriam addressing two letters Mr. Kelsey sent to her and to the undersigned.  See Transcript of July 27, 2017 Hearing ("7/27/17 Hr'g Tr.") at 2:22–4:19 (Doc. No. 201), United States v. Kelsey, 17-cr-00036.  After docketing the missives, Judge Merriam underscored that letters "are not an appropriate way to communicate with the Court," id. at 4:13–4:14, and that Mr. Kelsey needed "to communicate with the Court through counsel."  Id. at 4:8–4:9.  Mr. Kelsey explained that he had communicated via letters in the state system, but conceded, "I guess I was wrong."[1]  Id. at 4:16.

Later in the Frye hearing, Mr. Kelsey was asked if he had seen the Government's proposed plea agreement and had a chance to discuss it with Attorney O'Reilly.  See 7/27/17 Hr'g Tr. at 13:7–13:25.  Mr. Kelsey responded that he had thrown it away, adding, "I'm not taking nothing.  We going to trial.  That's the end of it."  Id. at 13:24–25.  Upon further questioning, Mr. Kelsey reiterated, "I don't want to take no plea

---

[1] In spite of this exchange, Mr. Kelsey attempted to communicate with the court by letter again. See Order Return Submission (Doc. No. 50), United States v. Kelsey, 17-cr-00036.  On August 2, 2017, the court returned the letter, reminding Mr. Kelsey that he is represented by counsel and that "all pleadings must be filed."  Id.

agreements.  I don't care if they come down to 5, 4, 3, 2, 1 year, nothing. . . .  Straight

trial, that's all I want to do."  Id. at 14:17–22.  As the hearing progressed, Mr. Kelsey

volunteered that he would get "a paid Fed attorney" if the case proceeded to trial, which

Judge Merriam told him the undersigned was unlikely to allow given the fast-

approaching trial date.  Id. at 22:6–23:12.  Mr. Kelsey also asked about his arrest

warrant, which the court unsealed, see id. at 23:13–24:22, and questioned whether sex

trafficking is a federal crime, see id. at 25:15–18 ("I don't know more than you, but I had

a federal book and the federal chart and I didn't see none of this sex trafficking in it.").

Judge Merriam assured Mr. Kelsey that she had read the relevant statutes and

instructed Attorney O'Reilly to print sections 1591 and 1594 for his client.  Id. at 25:22–

26:3.  At the conclusion of the hearing, Judge Merriam determined that Mr. Kelsey was

informed of the Government's plea offer, that he declined it and wished to proceed to

trial, and that he understood that jury selection was set to begin on September 6, 2017,

with the start of evidence thereafter.  Id. at 26:13–27:6.

       A Pretrial Conference was held, without issue, on August 17, 2017.  See Minute

Entry for August 17, 2017 Pretrial Conference (Doc. No. 64), United States v. Kelsey,

17-cr-00036.  In total, from June 2017 until August 21, 2017, Attorney O'Reilly

attempted to meet with Mr. Kelsey approximately four to seven times.  April 28, 2023

Evidentiary Hearing Transcript ("4/28/23 Hr'g Tr.") at 15:2–15:9 (Doc. No. 69).  These

meetings were "generally very short," id. at 15:14–15, as Mr. Kelsey indicated each time

that he "wanted to go to trial, that he was innocent of these charges, [and] that he didn't

really want to review the evidence because he didn't think it was necessary."  Id. at

15:19–15:22.  In fact, Attorney O'Reilly noted that "the only instruction that he gave me

6

each and every time I met with him" was that he wanted to go to trial.  Id. at 15:22–

15:25.  Attorney O'Reilly conceded that he did not review discovery with Mr. Kelsey in

"any depth", id. at 16:3, but only because Mr. Kelsey "was not interested in doing that."

id. at 16:6.  Throughout his encounters with Mr. Kelsey, Attorney O'Reilly did not hear

the petitioner mention any delusions, see id. at 32:16–32:25, and Mr. Kelsey was

"generally oriented to time and space and the fact that he was facing criminal

charges[.]"  Id. at 33:1–3.

On August 21, 2017, Attorney O'Reilly moved to continue jury selection so that a

psychiatric evaluation of his client could be performed.  See Motion to Continue Jury

Selection (Doc. No. 66), United States v. Kelsey, 17-cr-00036; Motion for Psychiatric

Evaluation (Doc. No. 65), United States v. Kelsey, 17-cr-00036.  Attorney O'Reilly

sought a psychiatric evaluation of his client after learning from Mr. Kelsey's mother that

the petitioner had a history of mental health issues.  See 4/28/23 Hr'g Tr. at 18:5–18:13.

Without Mr. Kelsey's mother bringing the petitioner's medical history to his attention,

Attorney O'Reilly would not have thought Mr. Kelsey was incompetent.  Id. at 40:20–

41:2.  "I thought he was obstinate and difficult and I've had many clients like that. . . ."

Id. at 41:2–41:4.

At the August 23, 2017 hearing on the Motions, Judge Merriam informed Mr.

Kelsey that Attorney O'Reilly had learned of Mr. Kelsey's medical history while

preparing for trial and explained the purpose of a thorough mental health evaluation.

Transcript of August 23, 2017 Hearing ("8/23/17 Hr'g Tr.") at 3:18–5:7 (Doc. No. 202),

United States v. Kelsey, 17-cr-00036.  In response, Mr. Kelsey emphasized that he

"ain't got no mental problems [at Hartford Correctional]," id. at 4:4–4:5, and accused

Attorney O'Reilly of filing the Motions behind his back, see id. at 7:10–7:12.  Mr. Kelsey stressed that he had already been evaluated at Hartford Correctional Center, see id. at 6:24–7:3, and told the court that he was "not willing to comply" with a psychiatric evaluation for his federal case, id. at 14:14.  When Judge Merriam asked why Mr. Kelsey would not comply, he told her:

> Because I don't feel I need to talk to a shrink about anything.  I talk to God about my problems.
> . . .
> I . . . just want to get this thrown out.  I don't -- I'm not worried about my mental health right now.  I'm not trying to have that on file about where's my mental health.  I'm not -- that's not my concern.

Id. at 14:18–14:19, 14:25–15:5.

Despite Mr. Kelsey's representations that he would not comply, Judge Merriam recommended that the court continue jury selection and order a psychiatric evaluation. See Order (ECF No. 71), United States v. Kelsey, 17-cr-00036.  In support of her recommendation, Judge Merriam cited Mr. Kelsey's previous diagnosis with "a serious mental illness, including a thought disorder that may affect his ability to think clearly." Id.  Judge Merriam also considered "Mr. Kelsey's communications with the Court, including by letter; his statements on the record; and his relationships with the various attorneys appointed to represent him."  Id.  Absent objection by the parties, the recommended ruling was affirmed and adopted by the undersigned on August 25, 2017. See Order (Doc. No. 76), United States v. Kelsey, 17-cr-00036.  Pursuant to section 4247(b) of title 18 of the United States Code, the court designated Dr. Howard Zonana of the Yale School of Medicine to complete, or to supervise the completion of, a psychiatric evaluation of Mr. Kelsey.  Id.

On September 12, 2017, the undersigned held a hearing to address Mr. Kelsey's threatened non-compliance with the psychiatric evaluation. <u>See</u> Transcript of September 12, 2017 Hearing ("9/12/17 Hr'g Tr.") at 3:9–4:15 ("Unless you cooperate with the doctor and let him talk to you, I can't let you go through with the trial") (Doc. No. 203), <u>United States v. Kelsey</u>, 17-cr-00036.  After the court restated the purpose of the evaluation, Mr. Kelsey replied, "I guess we're not going to have a trial then because I'm not trying to sit down.  The only psychiatrist I have is God.  That's the only person I'm going to talk to."  <u>Id.</u> at 4:21–4:24.  Mr. Kelsey added:

> I don't know what's going on here.  I know I'm physically and mentally fine and healthy.  You can call the jail.  I'm at level one at the jail.  I haven't gone to mental health one time.  I haven't taken one psyche drug or I haven't gotten one ticket in 10 months I have been in the jail.  I'm not going to talk to nobody.  I'm not talking to him.  Even if you send another attorney to me, I'm pleading the fifth on everybody.  The only time I'm going to talk is if we go to trial.  That's it.  That's all I have to say.

<u>Id.</u> at 5:10–5:20.  In a prolonged colloquy, the court reiterated that there would be no trial without a determination of competency.  <u>See id.</u> 10:13–11:6.  When the possibility arose of remanding Mr. Kelsey to a federal medical facility so that an evaluation could be conducted, Mr. Kelsey agreed to cooperate with the Yale School of Medicine.  <u>See id.</u> at 17:1–17:5 ("Forget it.  I will sit down with the shrink.  If you are going to force me to go to federal custody just to see the shrink, damn, I will do it.  Have him come talk to me in the jail, whatever.  This is crazy.").  That afternoon, Mr. Kelsey met with Dr. Zhong, then-a Forensic Psychiatry Fellow with the Law and Psychiatry Division of the Yale School of Medicine.  <u>See</u> Competency to Stand Trial Evaluation and Report at 1, 14 ("Dr. Zhong's 2017 Report") (Doc. No. 116).

In a report dated November 1, 2017, Dr. Zhong concluded that Mr. Kelsey was "suffering from a major mental illness that interfered with his ability to rationally understand the nature and consequences of the proceedings against him and his ability to assist properly in his defense."  Id. at 14.  In forming this opinion, Dr. Zhong met with Mr. Kelsey for 3.5 hours, spoke with Attorney O'Reilly and Mr. Kelsey's mother, and reviewed both medical records as well as police records relating to the underlying charges.  Id. at 1–4.  Based on that data—including records from prior hospitalizations for manic episodes of Bipolar Disorder, with one episode "mixed with psychotic features", see id. 7–8—Dr. Zhong assessed that:

> Although Mr. Kelsey was able to state the roles of various members of the court, he did not demonstrate the ability to rationally understand the proceedings against him.  Instead, he was fixated on delusional beliefs about his accusers and about law enforcement, court personnel, and trial procedures.  These beliefs were expressed via tangential, disorganized, and illogical thought process and were resistant to modification and alternative explanations.
>
> Mr. Kelsey also did not demonstrate the ability to assist in his defense.  His delusional beliefs prevented him from formulating rational defense strategies and he maintained an irrational, grandiose confidence that he would prevail.  He could not cooperate effectively with his attorney even when he expressly stated an intention to do so.  Instead, his preoccupation with delusional beliefs interfered with his ability to have productive conversations about his legal situation.

Id. at 14.  Even though he opined that Mr. Kelsey was incompetent, Dr. Zhong also opined that there was a "substantial probability that [Mr. Kelsey] could be restored to competence through an inpatient psychiatric hospitalization of approximately 60 days and appropriate treatment in that setting, such as psychotropic medications."  Id.

On November 21, 2017, Dr. Zhong testified at a hearing on Mr. Kelsey's competence born out of his Report.  Transcript of November 21, 2017 Hearing ("11/21/17 Hr'g Tr.") at 16:17–27:4 (Doc. No. 204), United States v. Kelsey, 17-cr-

00036.  After hearing the doctor's testimony, Mr. Kelsey made clear that he would "not take any pills" or "do the restorative process" Dr. Zhong outlined.  See id. at 27:9–27:11. Regardless, the court found, by a preponderance of the evidence, that Mr. Kelsey was incompetent and "suffering from a major mental illness that interferes with his ability to understand the nature and consequences of the proceedings against him."  Id. at 31:1– 31:4.  Moreover, the court ordered that Mr. Kelsey be committed to the custody of the United States Attorney General for "placement in a suitable facility for assessment and treatment necessary to attempt to restore him to a mental health status that allows him to comprehend the seriousness of the charges against him and to assist in defending against those charges."  Id. at 31:20–31:25.  The duration of such placement was to be up to four months.  Id. at 32:1–32:7.

      B.    <u>Commitment to Federal Medical Center (FMC) Butner</u>

A month later, in December 2017, Mr. Kelsey was admitted to FMC Butner.  See Petitioner's Exhibit 10, Forensic Evaluation and Opinion ("Dr. Marquez's Report") at 1 (Doc. No. 74).  Upon admission, Mr. Kelsey was oriented to person, place, and time; knew why he was in the hospital; and was experiencing neither delusions nor suicidal ideation.  See Petitioner's Exhibit 9, Butner Medical Records at 29 (Doc. No. 74). During his forensic intake examination, he was noted to be cooperative and using speech that was "free from bizarre content, non-tangential, and normal with regard to prosody."  Id. at 36.  When the topic of his case arose, Mr. Kelsey said there was no evidence, before adding, "A shrink inside the courthouse in New Haven was from college and said I had a mental problem because I said I plead the fifth.  I never had a mental problem."  Id.  Just a few hours later though, Mr. Kelsey complained to a nurse

that he was unsure why he was at FMC Butner, telling her, "I was on my way to college."  Id. at 60.

On January 3, 2018, Mr. Kelsey had a two-hour psychosocial assessment conducted by Dr. Marquez.  Id. at 79.  During the session, Mr. Kelsey "struggled to remain on one topic, often asking multiple questions and failing to remain attentive through the entire answer."  Id.; see also Dr. Marquez's Report at 6.  Dr. Marquez noted that this "improved some what after he was [able] to discuss his grievances about his case at length and the undersigned provided some empathic responses."  Butner Medical Records at 79; see also Dr. Marquez's Report at 6.  In discussing his health history, Mr. Kelsey "recalled being diagnosed with bipolar disorder but insisted this was inaccurate. . . ."  Butner Medical Records at 79.  At the conclusion of the meeting, Dr. Marquez believed Mr. Kelsey's behavior could be a result of mania, antisocial behavior, or other causes.  See May 18, 2023 Evidentiary Hearing Transcript ("5/18/23 Hr'g Tr.") at 60:4–60:8 (Doc. No. 68). Going forward, Dr. Marquez wrote, Forensic Evaluation Services would continue to meet with Mr. Kelsey, but she noted that no other referrals or interventions were warranted.  Butner Medical Records at 80.

On January 5, 2018, the multi-disciplinary team working with Mr. Kelsey met to put together his individualized care plan.  Id. at 213.  The team was comprised of Dr. Marquez as well as a psychiatry specialist, a social worker, a nurse, and a recreational therapist.  Id.  Although Mr. Kelsey failed to appear for the meeting, the team still created the plan in his absence.  Id. at 213–15.  The plan targeted a single problem: Mr. Kelsey's competency to stand trial.  Id. at 214.  To achieve the goal of restoration, the team focused on a host of interventions, including "Clinical Interviews, Psychological

12

Testing, Diagnostic Assessment, Multidisciplinary Consultation, Collateral Review, Competency Restoration Group, and Completion of An Evaluation."  Id.  The team indicated that the potential barriers to his successful treatment included poor historical treatment compliance as well as Mr. Kelsey's history of substance abuse.  Id.  However, Mr. Kelsey was also identified as possessing many strengths that would aid in the success of treatment, such as "good reality contact."  Id.

On January 16, 2018, Mr. Kelsey met with a physician for a general medical examination.  Id. at 86.  The doctor reported no abnormal findings, noting in particular that Mr. Kelsey had no fever and no insomnia.  Id. at 86, 89.  Mr. Kelsey's next psychological testing appointment was scheduled for January 19, 2018, but he did not attend it.  Id. at 92.  When personnel at FMC Butner located Mr. Kelsey and notified him of the appointment, "he refused to participate in testing."  Id.

Mr. Kelsey was forced to meet with Dr. Marquez on January 26, 2018, after he was heard making aggressive statements over the phone.  Id. at 94; Dr. Marquez's Report at 7.  On the call, he had demanded money from his mother so that he could "bond" out, despite being told that this was not possible in light of his commitment pursuant to section 4241(d).  See Butner Medical Records at 94; Dr. Marquez's Report at 7.  Mr. Kelsey also "made paranoid accusations about [his girlfriend] and his mother," and used expletives to complain about Dr. Marquez.  Butner Medical Records at 94; Dr. Marquez's Report at 7.  When confronted about the call, Mr. Kelsey "acknowledged making aggressive statements, but insisted he was merely venting on the phone to his mother."  Butner Medical Records at 94; see also Dr. Marquez's Report at 7.  Mr. Kelsey declared he would not physically harm any staff member or woman, and that he

was merely frustrated by his legal situation.  See Butner Medical Records at 94; Dr. Marquez's Report at 7.  Mr. Kelsey also expressed that the reason he did not wish to participate in the psychological testing was that he "didn't want to incriminate himself . . . ."  5/18/23 Hr'g Tr. at 73:12.  Still, he committed to cooperating with the evaluation process going forward, and remained calm, cooperative, and coherent throughout the interaction.  See Butner Medical Records at 94; see also Dr. Marquez's Report at 7.

Dr. Marquez next saw Mr. Kelsey on January 31, 2018.  During the session, Dr. Marquez used the MacArthur Competence Assessment Tool–Criminal Adjudication (MacCAT-CA), which is a structured interview geared towards assessing a person's knowledge of the court process and views of his case.  Id. at 96; see also Dr. Marquez's Report at 13.  In the first section of MacCAT-CA, Mr. Kelsey "was partially able to identify elements of the hypothetical charges, rights he loses by pleading guilty . . ., and the roles of the lawyers and judge.  Often, despite his confidence, he was unable to explain these concepts fully or added erroneous information."  Butner Medical Records at 96; see also Dr. Marquez's Report at 13.  In that first section, Mr. Kelsey scored 11 out of 16 points, placing him in the "minimal/no impairment range.  See Butner Medical Records at 96; Dr. Marquez's Report at 13.  Mr. Kelsey also performed well in the reasoning section related to the hypothetical scenario, as he was "consistently able to identify the more important pieces of information . . . to share with a lawyer and provide[d] coherent rationales for his choices."  Butner Medical Records at 96; see also Dr. Marquez's Report at 13.  Accordingly, Mr. Kelsey scored 15 out of 16 points for that section, again landing him in the "minimal/no impairment range."  Butner Medical Records at 96; see also Dr. Marquez's Report at 13.  However, in the appreciation

14

section—which asks a person to compare his own case to others like it and to discuss likely outcomes—Mr. Kelsey's score plummeted to a 1 out of 12.  See Butner Medical Records at 96; see also Dr. Marquez's Report at 13.  Dr. Marquez's notes indicate that Mr. Kelsey consistently failed to make a judgment and instead offered rationales that were dismissive of his case.  See Butner Medical Records at 96; see also Dr. Marquez's Report at 13.  For example, when asked about the likelihood of punishment if he was found guilty, Mr. Kelsey maintained, "I'm not getting no punishment.  They're not getting no time out of me other than time served."  Butner Medical Records at 96; Dr. Marquez's Report at 13.  While the 1 out of 12 score suggests a "clinically significant impairment in [Mr. Kelsey's] appreciation of the seriousness of his case", Butner Medical Records at 96, ultimately, Dr. Marquez did not strictly interpret the score that way because she did not feel it captured "the essence of what [she] was seeing in his behavior at that section of the test."  5/18/23 Hr'g Tr. at 93:11–93:12.

During the same January 31, 2018 session, Dr. Marquez discussed Mr. Kelsey's medical history with him.  Butner Medical Records at 95.  Mr. Kelsey only recalled experiencing a single manic episode in 2008, which he said was due to ecstasy use. See Butner Medical Records at 96.  He denied having a second episode in 2011, despite being presented with records to the contrary.  Id.  Dr. Marquez remarked that Mr. Kelsey "appeared genuinely confused by the assertion."  Id.  In an administrative note documenting the encounter, Dr. Marquez recounted the manic symptoms that accompanied Mr. Kelsey's prior episodes: "grandiosity, decreased sleep, productive speech, irritability/euphoria, hallucinations, delusions, [and] bizarre behavior (boiling rocks)."  Id. at 95.  Dr. Marquez then noted that Mr. Kelsey exhibited "productive

15

speech, paranoia related to his case, and hostility toward family", id., but was not presenting any of the remaining symptoms attendant to prior manic episodes, id.  Thus, Dr. Marquez concluded that Mr. Kelsey has a "vulnerability to becoming manic" even if it is "unclear if [he] has stand alone Bipolar Disorder."  Id.  Additionally, Dr. Marquez submitted a psychiatric consultation request for Mr. Kelsey.  Id.

The psychiatric consultation was completed by Dr. Logan Graddy on February 12, 2018.  Id. at 98.  After a brief period of talking, the evaluation was cut short by Mr. Kelsey, who expressed that he did not believe it was in his best interests to continue. Id.  Mr. Kelsey told Dr. Graddy that he did not trust his attorney, but "said it's his right not to[ ] if he does not want to."  Id.  Dr. Grady noted that Mr. Kelsey expressed this position "in a logical manner, from his perspective."  Id.  Mr. Kelsey also denied experiencing hallucinations and possessing a history of mental illness, adding that "he did not want to take any psychiatric medications."  Id.; Dr. Marquez's Report at 8. According to Dr. Graddy, the interview "ended politely and on good terms."  Id.  This was Mr. Kelsey's only contact with a psychiatrist while at Butner.  5/18/23 Hr'g Tr. at 98:18–98:20.  Dr. Marquez did not schedule any additional sessions with a psychiatrist because, through her "continued monitoring", id. at 98:25, she determined that Mr. Kelsey "wasn't actively showing signs of bipolar [disorder]."  Id. at 99:1–2.

Mr. Kelsey's next documented encounter with a mental health professional occurred on March 2, 2018, when he stopped a psychology intern on her way out of his unit.  Butner Medical Records at 99.  According to the intern's Report, Mr. Kelsey demanded the chief psychologist's name, discussed refusing to participate in the evaluation process, and "spoke continuously unless clinician interrupted."  Id.  He

reiterated that the case against him was "all lies" and that he does not have to work with his attorney.  Id.  The interaction only ended when the intern stated that the conversation was over.  Id.

After that encounter, Dr. Marquez informally met with Mr. Kelsey on March 14, 2018, to address his questions about the duration of his evaluation.  Id. at 100.  Mr. Kelsey maintained that "he does not have federal charges because it is a fake indictment and he was never properly served a warrant."  Id.  However, when Dr. Marquez offered Mr. Kelsey the opportunity to review the indictment and arrest warrant in his case, "he passionately declined[,] insisting he did not want to look at them."  Id.

The next day, March 15, 2018, Mr. Kelsey stopped Dr. Marquez to ask about his release date but declined to participate in a formal meeting.  Id. at 101.  He also questioned whether Dr. Marquez was a doctor or a prosecutor, and "was unreceptive to feedback on the [doctor's] role in questioning him about his case."  Id.  Mr. Kelsey offered several other assertions about his case, which Dr. Marquez suggested was evidence of a "lack of legal knowledge and the tendency to put little effort into processing feedback before forming conclusions."  Id.  Mr. Kelsey also expressed a desire to return to court and reiterated that he is not "crazy."  Id.  While Mr. Kelsey was visibly agitated, his speech was "coherent and goal oriented," he "displayed no odd movements," and he "denied problems with his sleep or mood."  Id.

Mr. Kelsey's final documented encounter with a medical professional at FMC Butner was with Dr. Marquez on April 10, 2018.  Dr. Marquez's Report at 14.  During his discussion with Dr. Marquez, Mr. Kelsey asked if he was being evaluated "because someone thought he did not understand the court process, and challenged that he has

17

filed multiple legal filings to further his case, at least in state court."  Id.  Mr. Kelsey

posited that "he would not cooperate with his lawyer" because "he felt the lawyer was

trying to dominate the conversation rather than doing what Mr. Kelsey asked."  Id.

Moreover, Mr. Kelsey continued to maintain that he was improperly charged and was

"unreceptive to feedback that his failure to engage in the federal process was impacting

others' perception of him."  Id.  Finally, Mr. Kelsey insisted that his prior mental health

diagnoses were incorrect, and that his prior manic episodes were prompted by drug use

rather than illness.  Id.

       Beyond the interactions detailed above, Mr. Kelsey was constantly monitored

throughout this four-month period by correctional and nursing staff.  See 5/18/23 Hr'g

Tr. at 133:25–135:2.  During this time, Dr. Marquez did not conduct any collateral

interviews with Mr. Kelsey's family, employers, or prior clinicians, nor did she review any

law enforcement or educational records.  See 5/18/23 Hr'g Tr. at 32:20–36:11.

Additionally, Mr. Kelsey did not receive medication while at Butner because he declined

to take anything voluntarily, and Dr. Marquez assessed that he did not meet the

requirements necessary for forcible medication.  June 14, 2023 Evidentiary Hearing

Transcript ("6/14/23 Hr'g Tr.") at 57:21–58:12 (Doc. No. 72); 5/18/23 Hr'g Tr. at 82:21–

83:4.

       On April 19, 2018, Dr. Marquez memorialized Mr. Kelsey's four-month evaluation

in a report.  Dr. Marquez's findings were based on the aforementioned interactions as

well as behavioral observations and reviews of his medical records (including Dr.

Zhong's Report), relevant legal materials, and recordings of phone calls Mr. Kelsey

made while at FMC Butner.  Dr. Marquez's Report at 1–2.  Ultimately, Dr. Marquez concluded that:

> Mr. Kelsey currently suffers from a mental disease or defect, namely other specified personality disorder (antisocial and narcissistic traits), but which does not render him incompetent to stand trial.  Although he is diagnosed with a bipolar disorder, this fact should not be used to assume that any uncooperative behavior is a resurgence of symptoms.  As reviewed above, his continued attitude toward his case is reflective of poor judgment related to his personality rather than mania.  Thus, he is able to proceed.

Id. at 15.  Her determination was based on her view that Mr. Kelsey possessed a reasonable understanding of the court process, and that his "primary barrier to rationally understanding his case [was] his own willingness to listen to and integrate information from others."  Id. at 14.  His struggle in this respect, she noted, "appears more related to criminal-oriented cognitive errors, rather than manic or psychotic processes."  Id.  Additionally, Dr. Marquez assessed that Mr. Kelsey's ability to assist his lawyer in his defense was within his own control.  Id. at 14–15.  Any lack of cooperation on Mr. Kelsey's part, according to Dr. Marquez, "is rooted in his belief he knows best for his case and his dissatisfaction with his lawyers not heeding his demands."  Id. at 15.

In response to Dr. Marquez's Report, the court ordered that Mr. Kelsey be returned to the District of Connecticut.  See Order (Doc. No. 123), United States v. Kelsey, 17-cr-00036.  The Order required that Mr. Kelsey be brought back by April 27, 2018, for several reasons, including the dwindling number of days remaining on the speedy trial "clock," Mr. Kelsey's explicit and repeated interest in going to trial as quickly as possible, as well as the pregnancy of a key witness who might be rendered unavailable to testify for months if the trial was continued further.  Id. at 1–2.  The Warden of the Butner complex signed a Certificate of Restoration of Competency to

19

Stand Trial on April 23, 2018, <u>see</u> Butner Medical Records at 106, and a competency

hearing was scheduled for April 30, 2018, <u>see</u> Notice (ECF No. 125), <u>United States v.</u>

<u>Kelsey</u>, 17-cr-00036.

     C.    <u>Post-Commitment Proceedings</u>

     At the April 30 hearing, Mr. Kelsey was represented by new counsel because his

prior attorney, Frank O'Reilly, had been nominated to serve as a judge of the

Connecticut Superior Court on April 13, 2018.  <u>See</u> Motion to Withdraw (Doc. No. 121),

(ECF No. 125), <u>United States v. Kelsey</u>, 17-cr-00036.  By April 30th, attorneys Bruce D.

Koffsky ("Attorney Koffsky") and Audrey A. Felsen ("Attorney Felsen") had represented

Mr. Kelsey for a little more than a week, <u>see</u> CJA Records & Expenses (Doc. No. 51),

and had met with their new client twice, <u>see</u> Transcript of April 30, 2018 Hearing

("4/30/18 Hr'g Tr.") at 4 (Doc. No. 205), <u>United States v. Kelsey</u>, 17-cr-00036.  In their

early days on the case, Attorneys Koffsky and Felsen devoted many hours to speaking

with Attorney O'Reilly, reviewing the Reports penned by Dr. Zhong and Dr. Marquez,

researching competency issues, and deciding upon a strategy.  4/28/23 Hr'g Tr. at

90:12–90:17; July 6, 2023 Evidentiary Hearing Transcript ("7/6/23 Hr'g Tr.") at 5:10–

5:20 (Doc. No. 75); CJA Records & Expenses at 2–5.  However, the attorneys did not

reach out to Dr. Zhong to solicit his view on Dr. Marquez's Report and the efforts BOP

undertook to restore competency.  <u>See</u> 4/28/23 Hr'g Tr. at 89:19–89:22; Exhibit B, Dr.

Zhong's Report on BOP Efforts to Restore Competency ("Dr. Zhong's 2022 Report") at

6 (Doc. No. 41) ("[A]t no point did his defense attorneys contact me to seek an opinion

about his competence restoration, nor did anyone provide me with records related to his

case.  Had I been asked, I would have been available to testify and perform further

20

evaluation.").  Nor did counsel seek Mr. Kelsey's underlying records from Butner. 4/28/23 Hr'g Tr. at 102:8–102:12.

Around this time, Attorney O'Reilly was under the impression that Mr. Kelsey was returning from Butner as competent, later testifying that the petitioner met his understanding of the competency standard, "and [that he] would have told Mr. Koffsky that."  4/28/23 Hr'g Tr. at 40:13–40:17.  Attorney Koffsky spoke with Attorney O'Reilly about Mr. Kelsey "between three and five times."  Id. at 160:15–165:17.  Attorney Koffsky added that Attorney O'Reilly relayed "some behavioral problems," but that Attorney Koffsky did not have an impression of Mr. Kelsey until they met.  Id. at 160:25–161:2.  Similarly, Attorney Felsen spoke with Attorney O'Reilly about his representation of Mr. Kelsey at least twice, 7/6/23 Hr'g Tr. at 33:3–33:11, and her takeaway from these conversations was that Attorney O'Reilly and Mr. Kelsey "were able to communicate when Mr. Kelsey wanted to communicate with Mr. O'Reilly and that he may be struggling with mental health issues.  It wasn't put in those words, but he felt that he could understand what was going on."  Id. at 12:1–12:5.

Attorney Koffsky's first meeting with Mr. Kelsey was on April 29, 2018, the day before the competency hearing.  See, e.g., 4/28/23 Hr'g Tr. at 94:3–94:9.  After only ten minutes, Mr. Kelsey terminated the meeting.  Id.  According to Attorney Felsen, who was not at this meeting, counsel did not find this "surprising given what Attorney O'Reilly described as his interactions with Mr. Kelsey."  7/6/23 Hr'g Tr. at 14:20–14:22.

The April 30th hearing began with the court asking defense counsel whether they would object to a determination that Mr. Kelsey was competent to stand trial.  See 4/30/18 Hr'g Tr. at 2:25–3:6.  Attorney Koffsky replied that the defense would not object

to such a finding, even though "there was a finding of noncompetence" six months prior.
Id. at 3:7–4:5.  Based on the brief meetings with Mr. Kelsey prior to the hearing,
Attorney Koffsky represented that his client was affable, engaged, and seemed like "he
wants to participate in the defense. . . ."  Id. at 4:14–4:15.  Attorney Koffsky also cited
Second Circuit case law in distinguishing behavior issues from competency issues, and
he averred that, "during the course of trial, [he would] be cognizant of [his] client's
mental health, and  [he ] ask[ed] the Court to be as well."  Id. at 4:17–5:24.  The
Government, too, offered no objection to a finding of competency.  Id. at 7:7–7:16.  As
such, the court offered its Ruling from the bench:

> I'm mindful of the opinion rendered by Dr. Zhong back last year but upon review
> of Dr. Marquez's report, . . . it is the conclusion of this Court that although there
> are certain challenges or conditions that the doctor finds Mr. Kelsey currently
> suffers from, the conclusion of Dr. Marquez is none of them [render] him
> incompetent to stand trial.
>
> In other words, . . . he understands . . . the charges against him and he can
> assist in his defense and therefore, the Court finds that Mr. Kelsey is competent
> and . . . we will plan to proceed to trial in this case. . . .

Id. at 8:23–9:10.

Following the determination that Mr. Kelsey was competent to stand trial, the
court held a pre-trial conference on May 1, 2018, and a renewed Frye hearing on May
14, 2018.  See Transcript of May 1, 2018 Pretrial Conference ("5/1/18 Hr'g Tr.") (Doc.
No. 206), United States v. Kelsey, 17-cr-00036; Transcript of May 14, 2018 Hearing
("5/14/18 Hr'g Tr.") (Doc. No. 207), United States v. Kelsey, 17-cr-00036.  At the Frye
hearing, Attorney Koffsky noted that his client refused to discuss any potential plea
agreements with counsel.  5/14/18 Hr'g Tr. at 11:21–12:13.  After explaining the
charges Mr. Kelsey faced, the potential maximum and minimum penalties, the

difference between consecutive and concurrent sentences, the evidence the Government intended to elicit at trial, and the consequences of the plea deal the Government offered, the court recessed for Mr. Kelsey to converse with his attorneys once more.  See id. at 21:23–22:2.  Following the recess, Mr. Kelsey twice indicated that he wanted to move forward with trial "[o]ne hundred percent."  Id. at 22:15–18, 23:16–19.  The court followed up this remark by confirming that Mr. Kelsey was feeling well and that he understood everything that was said concerning the potential plea.  Id. at 22:19–22:24.  Therefore, the court determined that Mr. Kelsey "knowingly rejected the plea agreement as well as his right to plead without a plea agreement", id. at 24:24–25:1, and proceeded to jury selection, see id. at 25:2–25:5.

The next morning, mere moments before evidence was set to begin, Mr. Kelsey requested new counsel.  See Transcript of Trial on May 15, 2018 ("5/15/18 Trial Tr.") at 2:13–17 (Doc. No. 208), United States v. Kelsey, 17-cr-00036.  Whereas the day before he was "one hundred percent" certain about proceeding to trial, see 5/14/18 Hr'g Tr. at 22:15–22:18, on May 15th he asked for a pause:

> Everything is moving too fast.  I got these attorneys last week.  We haven't read everything.  We haven't put in any type of motion or go over discovery.  His outlook on the whole situation is not positive.  I don't think he's able to assist me in the best manner.  I think I should have the right to get private counsel.  I haven't asked for private counsel since I have been in the courthouse.

5/15/18 Trial Tr. at 2:20–3:2.

Mr. Kelsey continued by delineating his concerns with his representation as well as his confusion about the proceedings in the following colloquy with the court:

> THE DEFENDANT: [Attorney Koffsky] never came to see me with the discovery.  He came to see me on one occasion.  I never even got appointed with him when I came to court, so I wasn't sure who he was.  He came and told me he was my attorney without me being arraigned in court.  When I do come to court that's

23

telling me within a week's time that we're going to go trial.  He doesn't come to visit me.  Every time I came to the courthouse, he doesn't come and visit me before we got in the courtroom.  You know what I'm saying?  He had all this figured out.  Yesterday he had discriminated jurors.  He didn't let me pick at least two, three on the list.  You know, what I'm saying.  It's like he's working without me.  I feel I can get a better lawyer to assist me in this case.
. . .

THE COURT: Mr. Kelsey, how many times have you been here in front of me?  I'm a federal judge.  This is the federal court.  How could that be confusing to you?

THE DEFENDANT: We have the same matter in front of the state court with the same victims and the same witness.  How I know to pay money for a state attorney or a federal attorney.  I'm not dropping either case.  Is it federal or is it state?  That's confusing.

My people don't know which way to operate.  I didn't want to waste no money I'm trying to tell you on a state attorney or a federal attorney not know which one is going to plead with the case.  Do you know what I'm saying?

Id. at 3:9–4:18.

Mr. Kelsey's concerns about moving forward with trial also included his time at

FMC Butner: "[T]hey sent me away for four months.  That blocked out of time of me

getting prepared for my case as well.  I couldn't do things."  Id. at 6:3–6:5.  The court

responded to Mr. Kelsey's issues by reminding him that his case was initiated months

before his time at FMC Butner, and that three different attorneys withdrew from his case

because he would not cooperate with them.  Id. at 6:6–6:15.  Indeed, the court

reiterated that Mr. Kelsey should be cooperating with and talking to his counsel now,

even if he does not always like what they have to say.  Id. at 6:16–6:22.  The court's

remarks prompted the following exchange:

THE DEFENDANT: I said I wanted to go trial.  Not one time did I say I had the right counsel for me to go to trial with.  I never got that privilege.  When they took this lawyer from me, when they said he promoted to be a judge or whatever, you didn't ask me did I want to get private counsel.  You stuck these people with me.  You could have asked me.  I could have told you from there.  When this person

24

got promoted to be a judge, you told me I had an option to hire private counsel or get these people, I would have went with getting private counsel.

THE COURT: When I replaced the lawyer and gave you Attorney O'Reilly, did you tell me then you wanted private counsel?  Because you didn't like Mr. O'Reilly and Mr. O'Reilly I like, is a very good lawyer and you wouldn't talk to him.

THE DEFENDANT: I was confused at the fact that they told -- my state attorney told me that once the feds pick up the case, the State will be dropped.  You know what I'm saying?  I didn't know where should I fund my money on a federal lawyer or a state attorney.

THE COURT: Doesn't that tell you[?]  They told you the right thing.  They said when it went federal, the state goes to the backseat.

Id. at 6:23–7:21.

Later in the prolonged back-and-forth, Mr. Kelsey again expressed that he would have procured his own counsel had he internalized the difference between his state and federal case.  Id. at 9:1–9:7.  He stated that he hired an attorney to represent him in the state case, and that he needed to do the same here: "The jurors is picked, things going on.  I feel that I should have private counsel to represent me.  I don't feel they are doing my private best interest."  Id. at 9:5–9:7.  When the court pointed out that Mr. Kelsey did not raise any of these issues at the pretrial conference two weeks earlier, he changed tact:

I understand what you are saying, but I still didn't have enough time to prepare myself for anything.  You know what I'm saying?  I just got these people just a week ago.  A week later we're going to trial.  We didn't have to go over nothing.  They want me to write down the witnesses right now.  They rushing me through this.  Then he's telling me I'm going to get smoked.  How you going to have a lawyer tell you the outcome of a trial before you even start?

Id. at 9:24–10:7.  Mr. Kelsey insisted that he was "not trying to play games", id. at 12:1, and that he possessed "a right to not go forward", id. at 15:24, but the court denied his

25

effort to adjourn the proceedings to hire private counsel because he failed to raise the issue "until 12 minutes before the evidence is beginning." Id. at 16:11–16:12.

With the request for new counsel dispensed with, the trial began. Id. at 18:24. The rest of the morning proceeded without issue, but, in the afternoon, Attorney Koffsky requested that the jury be excused to address an issue with Mr. Kelsey. Id. at 206:15–206:17. In the absence of the jury, Attorney Felsen told the court that she and Attorney Koffsky were having trouble hearing the witness' examination as Mr. Kelsey was speaking at the same time. Id. at 207:1–207:11. The court told Mr. Kelsey that he had a right to be present at trial and encouraged him to exercise that right, but added that if he continued to "make noise such that [his] lawyers or I or the jury is having trouble, one, hearing, and, two, concentrating on the evidence, then [he would] have to be removed from the courtroom." Id. at 207:22–207:25. At this point, Mr. Kelsey rehashed many of the issues he voiced before evidence began. Id. at 208:8–208:22 ("This lawyer was your pick. This isn't my pick. . . . He picked every juror. Didn't give me one say-so about none of the jurors. . . . Now I'm stuck with this guy. . . . He's not objecting. We didn't have no suppression hearing, no probable cause hearing for the trial. . . ."). He mentioned that he didn't care about "being present or not" and that he was going to appeal the case anyway. Id. at 209:1. However, after a brief follow up, Mr. Kelsey said he would stay and explained that he "just got aggravated." Id. at 209:19. The court clarified that Mr. Kelsey would abide by its rules if he stayed, and Mr. Kelsey made clear that he wouldn't "say another word." Id. at 210:7.

After that disruption, there were no other significant issues with Mr. Kelsey's behavior. See Transcript of Trial on May 16, 2018 ("5/16/18 Trial Tr.") (Doc. No. 209),

United States v. Kelsey, 17-cr-00036; Transcript of Trial on May 17, 2018 ("5/17/18 Trial Tr.") at 2 (Doc. No. 210), United States v. Kelsey, 17-cr-00036; Transcript of Trial on May 21, 2018 ("5/21/18 Trial Tr.") at 2 (Doc. No. 211), United States v. Kelsey, 17-cr-00036; Transcript of Trial on May 22, 2018 ("5/22/18 Trial Tr.") at 2 (Doc. No. 212), United States v. Kelsey, 17-cr-00036.

## IV.   LEGAL STANDARD

### A.   Section 2255 Petition

Section 2255 of title 28 of the United States Code permits a federal prisoner to move to vacate, set aside, or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Therefore, relief is available "under [section] 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000) (quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995)). The petitioner bears the burden of proving that he is entitled to relief by a preponderance of the evidence. See Skaftouros v. United States, 667 F.3d 144, 158 (2d Cir. 2011).

A claim for ineffective assistance of counsel may be raised for the first time in a section 2255 motion, "whether or not the petitioner could have raised the claim on direct appeal. . . ." Massaro v. United States, 538 U.S. 500, 504 (2003); accord Yick Man Mui v. United States, 614 F.3d 50, 54 (2d Cir. 2010).

27

B.    Ineffective Assistance of Counsel

The Sixth Amendment affords criminal defendants the right to "the effective assistance of counsel." Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  To prevail on an ineffective assistance of counsel claim, a petitioner must satisfy a two-prong test. Strickland v. Washington, 466 U.S. 668, 687–88 (1984).  First, a petitioner must prove that counsel's performance was objectively deficient.  Id. at 688.  Second, a petitioner must establish actual prejudice, which requires showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

The Supreme Court has acknowledged that the standard for evaluating counsel's representation is "a most deferential one," Harrington v. Richter, 562 U.S. 86, 105 (2011), and instructs that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance", Strickland, 466 U.S. at 689.  When analyzing prong one of the Strickland test, the key question is not whether counsel "deviated from best practices or most common custom," but whether the "representation amounted to incompetence under prevailing professional norms."  Harrington, 562 U.S. at 105.  For prong two, a petitioner's claim turns on whether he can demonstrate "a substantial, not just conceivable, likelihood of a different result."  Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quotation marks and citation omitted).

V.    **DISCUSSION**

Mr. Kelsey seeks relief on the ground that his trial counsel was constitutionally ineffective.  See Am. Mot. to Vacate Sentence at 1.  In particular, he contends that his trial counsel flouted their obligation to investigate his competence and challenge the

28

court's competency finding, as well as failing to review evidence with Mr. Kelsey.  See Pet'r's Mem. at 26–28.  The government opposes Mr. Kelsey's Motion, arguing that his arguments lack merit because the petitioner can demonstrate neither deficient performance nor actual prejudice.  See Gov't's Opp'n at 9.

   A.   Failure to Investigate Mr. Kelsey's Competence

   Mr. Kelsey first argues that his trial counsel was ineffective for failing to investigate Dr. Marquez's Report and challenge its conclusion that he was competent to stand trial.  See Pet'r's Mem. at 26.  "Due Process prohibits the criminal prosecution of a defendant who is not competent to stand trial."  United States v. Kerr, 752 F.3d 206, 215 (2d Cir. 2014) (quotation and citation omitted).  A defendant is incompetent if his "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense."  Id. (quoting Drope v. Missouri, 420 U.S. 162, 171, (1975)).  The two-prong test for competency asks (1) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "whether he has a rational as well as factual understanding of the proceedings against him."  United States v. Brennan, 928 F.3d 210, 215–216 (2d Cir. 2019) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)).  A defendant's competence is "the province of the courts," id. at 216, which must interpret the legal standard for competency and apply them to the facts at issue.  Id.

   Section 4241 of title 18 of the United States Code—the statutory scheme that safeguards this constitutional right—lays out the procedure for challenging a defendant's competency.  See 18 U.S.C. § 4241.  Either party or the court may move for a hearing to determine competency "if there is reasonable cause to believe that the

29

defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The court may order a psychiatric or psychological examination and report prior to the hearing, see U.S.C. § 4241(b), and, following the hearing, it may commit the defendant to the custody of the Attorney General for hospitalization to restore competency, see U.S.C. § 4241(d). If the director of the facility to which the defendant is committed believes the individual has recovered to the extent that he is now competent, the director files a certificate to that effect and the court holds a hearing "to determine the competency of the defendant." U.S.C. § 4241(e). If the court finds, by a preponderance of the evidence, that the defendant has recovered and is now competent, the defendant is discharged from the facility and a trial date is set. Id.

In assessing competency, the court "may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment." United States v. Schlueter, 276 F. App'x 81, 83 (2d Cir. 2008) (citing United States v. Nichols, 56 F.3d 403, 411 (2d Cir. 1995)). "[S]ince incompetency involves an inability to assist in the preparation of a defense or rationally to comprehend the nature of the proceedings, failure by trial counsel to indicate the presence of such difficulties provides substantial evidence of the defendant's competence." United States v. Estrada, 59 F. App'x 372, 374 (2d Cir. 2003) (quoting United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986)). Additionally, "it is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." United States v. Granton, 704 F. App'x 1, 4 (2d Cir. 2017) (quoting Vamos, 797 F.2d at 1150). Indeed, even if a defendant is "rude,

unreasonable, and myopic in his approach to th[e] case, that is not the same as

incompetence. . . ."  Kerr, 752 F.3d at 218 (quotation marks and citation omitted).

The Supreme Court has recognized a "constitutional duty to investigate,"

acknowledging that:

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable
> decision that makes particular investigations unnecessary.  In any ineffectiveness
> case, a particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of deference
> to counsel's judgments.

Strickland, 466 U.S. at 691.  Numerous circuit courts of appeal have recognized that the

duty to investigate extends to a defendant's competency.  See, e.g., Mullis v. Lumpkin,

47 F.4th 380, 392 (5th Cir. 2022) ("Where an attorney has reason to believe that his

client may be incompetent, effective representation may require him to inquire beyond a

clean bill of mental health from a court-appointed psychiatrist."); Williamson v. Ward,

110 F.3d 1508, 1513–1521 (10th Cir. 1997) (ruling upon petitioner's claim that he was

denied effective assistance of counsel due to his trial attorney's "failure to investigate

and use the evidence of [his] mental illness."); Agan v. Singletary, 12 F.3d 1012, 1018

(11th Cir. 1994) ("[C]ounsel has a duty to investigate a client's competency to stand trial

or plead guilty."); Beans v. Black, 757 F.2d 933, 936–37 (8th Cir. 1985) (deciding upon

petitioner's claim that counsel's failure to procure a second opinion as to competency

constituted a failure to investigate).  As the relevant American Bar Association ("ABA")

Standards make clear: "If defense counsel has a good faith doubt regarding the client's

competence to make important decisions, counsel should consider seeking an expert

evaluation from a mental health professional, within the protection of confidentiality and

privilege rules if applicable."  See ABA Criminal Justice Standards for the Defense

Function 4-5.2(c) (4th ed. 2017); Strickland, 466 U.S. at 688 (recognizing that "[p]revailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice . . ., are guides to determining what is reasonable").

Here, the ABA standard is of limited utility.  Attorneys Koffsky and Felsen testified that they had no concerns about Mr. Kelsey's competence, see 4/28/23 Hr'g Tr. at 171:6–171:13; 7/6/23 Hr'g Tr. at 35:24–35:25, and an expert evaluation of the petitioner was conducted.  That is partly why the Government contends that Attorneys Koffsky and Felsen satisfied their obligation to investigate Mr. Kelsey's competence by "review[ing] the Zhong Report and the Marquez Report, . . . research[ing] the caselaw surrounding competency to stand trial, and . . . [making] a careful determination of Kelsey's competence in view of that caselaw and after evaluating Kelsey's willingness to engage with counsel."  Gov't's Opp'n at 9.  This view is bolstered by Attorney Koffsky's testimony at the April 30, 2018 competency hearing, which demonstrate familiarity with the appropriate case law as well the prior determination of "noncompetence."  4/30/18 Hr'g Tr. at 3:15–5:2.

In arguing to the contrary, Mr. Kelsey emphasizes the limited opportunity trial counsel had to meet with him.  To that end, Mr. Kelsey highlights that he "ended" his April 29, 2018 meeting with Attorney Koffsky after a few minutes, adding that they "did not talk about what happened at Butner."  Declaration of Toney Kelsey at ¶ 4 (Doc. No. 49–1).  This leaves only the limited interaction Mr. Kelsey had with Attorneys Koffsky and Felsen before the competency hearing.  Nonetheless, given Mr. Kelsey's track record with counsel in this case, Attorney Felsen testified that his behavior in that brief

meeting was not "surprising given what Attorney O'Reilly described as his interactions with Mr. Kelsey."  7/6/23 Hr'g Tr. at 14:20–14:22.  Indeed, Attorney Felsen's takeaway from her discussions with Attorney O'Reilly was that he and Mr. Kelsey "were able to communicate when Mr. Kelsey wanted to communicate with Mr. O'Reilly. . . ."  Id. at 12:1–12:2.  Not only that, but Attorney Koffsky assessed that there was "nothing" about Mr. Kelsey's behavior in their meetings the day before and the day of the competency hearing "that indicated to [him] an incompetence which would contradict the report from Butner."  4/28/23 Hr'g Tr. at 124:6–8; see also id. at 164:15–22 (clarifying once more that there was "no information or observations" by Attorney Koffsky or anyone he spoke to that indicated that, at that point, Mr. Kelsey was incompetent).  Accordingly, Attorney Koffsky's reference to Kerr at the competency hearing signaled his understanding— based on his own experience, the experience of his predecessor, and Dr. Marquez's Report—that a defendant being "rude, unreasonable, and myopic in his approach to th[e] case . . . is not the same as incompetence. . . ."  Kerr, 752 F.3d at 218.

Mr. Kelsey also maintains that Attorneys Koffsky and Felsen were obligated "to investigate the BOP's 'treatment,' 'restoration' to competency, and report with an available expert, Dr. Zhong."  Pet'r's Mem. at 26; Pet'r's Suppl. Brief at 54.  In support of this contention, Mr. Kelsey points to precedent indicating that "[c]ounsel could have been ineffective either by failing to make reasonable investigation into petitioner's competency or by failing to make a reasonable decision that such investigation was unnecessary."  Futch v. Dugger, 874 F.2d 1483, 1487 (11th Cir. 1989).  The alleged failure to make reasonable investigation at issue in Futch is illuminating in contrast to what Attorneys Koffsky and Felsen did here.  In Futch, the petitioner alleged that trial

counsel knew that a prison psychologist evaluated and declared the petitioner incompetent, but "failed to obtain [the evaluation] or to interview the psychologist."  Id. In the case at bar, Attorneys Koffsky and Felsen read both evaluations of their client and relied upon the more recent evaluation—one made after a four-month commitment to a BOP facility for the express purpose of restoring competence.  See, e.g., 4/28/23 Hr'g Tr. at 163:17–163:19 (testifying at the evidentiary hearing, Attorney Koffsky highlighted that he "credited the more recent report from Butner which would indicate what his present state of mental health was.").  This decision is decidedly different from disregarding potential evidence of their client's continuing incompetence as in Futch.

Mr. Kelsey's contention that Attorneys Koffsky and Felsen failed to investigate really amounts to an assertion that they failed to seek a second opinion from Dr. Zhong for Dr. Marquez's Report.  See Pet'r's Mem. at 14.  Yet, Mr. Kelsey cites no case law detailing such an obligation.  In fact, the Eighth Circuit has articulated a contrary conclusion:

> [Counsel's] failure to procure a second opinion as to [petitioners'] competency is likewise an alleged failure to investigate.  Although it might have been preferable to have procured this independent opinion, we cannot say that [counsel's] failure to do so was unreasonable under the standard set out in Strickland.  It appears from the evidence at the time of the original hearing and that gathered at the post-conviction hearing that [counsel] did not believe [petitioner] to be incompetent but merely uncooperative.  The doctors . . . had had ample time in which to evaluate [the petitioner] and there was no reason for [counsel] to question their judgment [of competency].

Beans v. Black, 757 F.2d 933, 936 (8th Cir. 1985).  A determination of incompetence in November 2017 does not undermine a contrasting conclusion made five months later. As such, it was reasonable for Attorneys Koffsky and Felsen to depend upon Dr.

Marquez's Report, especially as it reinforced their own view of their client's competency.[2]

Another Eighth Circuit case further supports this conclusion.  In <u>King v. Kemna</u>, the Eighth Circuit held that counsel was "not ineffective even if he did fail to seek a second evaluation of his client for the purpose of challenging [the doctor's] opinion that [the petitioner] was competent to stand trial."  266 F.3d 816, 824 (8th Cir. 2001).  In <u>King</u>, the petitioner had "made clear to [counsel] that he did not wish to be placed in a psychiatric institution, and the consequence of being adjudicated incompetent to stand trial is commitment to the state's department of mental health."  <u>Id.</u>; <u>see also</u> 4/28/23 Hr'g Tr. at 185:15–185:21 (noting that, if the court had lingering questions about Mr. Kelsey's competency at the hearing, a likely outcome would be "return[ing Mr. Kelsey] to Butner for continued observation and treatment").  Accordingly, the Eighth Circuit reasoned that "[c]ounsel was not obliged to disregard both [the doctor's] report and his client's wishes and further pursue a determination that his client was not competent to proceed."  <u>Id.</u>  In the case at bar, not only did Dr. Marquez's Report assess that Mr. Kelsey was competent to stand trial, but the petitioner also repeatedly maintained that he was not incompetent and wanted to proceed to trial.  <u>See, e.g.</u>, 9/12/17 Hr'g Tr. at 5:10–5:20; Dr. Marquez's Report at 5; 7/6/23 Hr'g Tr. at 112:18–112:19.  Mr. Kelsey rightly asserts that an "attorney cannot blindly follow a client's demand that his competency not be challenged[,]" Pet'r's Mem. at 26; <u>Agan</u>, 12 F.3d at 1018, but that is

---

[2] Indeed, it bears noting that Attorneys Koffsky and Felsen are very experienced criminal defense attorneys: Attorney Koffsky has practiced criminal law for over 25 years, and Attorney Felsen has practiced criminal law for over 20 years.  Both attorneys have extensive experience in representing and dealing with criminal defendants.

not what happened here.  Instead, Attorneys Koffsky and Felsen heeded not only their client's wishes, but also Dr. Marquez's clinical findings and their own observations, and those of Mr. Kelsey's prior counsel, in dealing with Mr. Kelsey.

Such an approach bears the hallmarks of a "strategic choice" made "after thoughtful consideration," a type of decision that is "virtually unchallengeable."  United States v. Rosemond, 958 F. 3d 111, 121 (2d Cir. 2020) (quotation marks and citation omitted).  This is especially true in light of Attorney Koffsky's promise that, "during the course of trial, I will be cognizant of my client's mental health, and I will ask the Court to be as well."  4/30/18 Hr'g Tr. at 5:18-5:24.  Indeed, the evidence suggests this was a reasoned choice not to challenge Mr. Kelsey's competence in light of Dr. Marquez's Report, Mr. Kelsey's wishes and current comportment, conversations with Attorney O'Reilly, and Second Circuit precedent exploring the contours of competence, while still remaining open to revisiting that decision should circumstances change.  See also 4/28/23 Hr'g Tr. at 144:20–145:2 ("[It was] my legal opinion at the time[,] as Toney Kelsey's attorney, that I'm going to rely on the Butner report that says he's competent and proceed to trial.").

In an attempt to undermine Attorneys Koffsky and Felsen's reliance on Dr. Marquez's Report, Mr. Kelsey maintains that the second evaluation was not conclusive, see Pet'r's Suppl. Brief at 55, and that it was inadequate and inconsistent with contemporaneous records, see id. at 55-59; Pt'r's Post-Hr'g Reply at 1-7.  In turn, Mr. Kelsey posits that Dr. Marquez's Report "'deserves less weight than it might otherwise be entitled to'" because it "'was never subjected to critical scrutiny at a competency hearing.'"  Pet'r's Suppl. Brief at 55 (quoting United States v. Houston, 603 F. App'x 7, 9

36

(2d Cir. 2015)).  However, the circumstances in the Second Circuit case cited for this proposition, United States v. Houston, are completely different from the case at bar.  In Houston, the court initially determined that the defendant was competent based on a report produced by FMC Butner.  603 F. App'x at 9.  Later, Houston's attorney requested a second competency hearing because his client engaged in a half-hour long rant that bordered on "babbling."  Id. at 8.  There, the court refused counsel's request, instead relying on the prior competency determination.  Id.  Based on that record, the Second Circuit concluded that the court abused its discretion by failing to order a second competency hearing, placing significant weight on defense counsel's view that his client did not have a "full grasp of reality."  Id. at 9.

Here, Attorneys Koffsky and Felsen had no concerns about their client's competency.  Moreover, unlike in Houston, there was no intervening period in which Mr. Kelsey could have decompensated.  Thus, even though Dr. Marquez and her Report were not subjected to cross examination, there were still other factors—including, inter alia, the recency of the Report and the ways in which its conclusions comported with the views of defense counsel based on their knowledge of their client, the case law, and the experience of their predecessor—weighing in favor of the reliance Attorneys Koffsky and Felsen placed on the Report.

Mr. Kelsey also argues that Attorneys Koffsky and Felsen "waived defendant's right to an evidentiary hearing on his competence after return from Butner."  Pet'r's Mem. at 27; Pet'r Suppl. Brief at 53.  This contention, however, is undermined by the Second Circuit's finding that this court held a competency hearing following Mr. Kelsey's return from FMC Butner.  See Kelsey, 807 F. App'x at 64.  Trial counsel may not have

presented their own witnesses or cross-examined personnel from FMC Butner, but they did not waive Mr. Kelsey's right to a hearing.

Finally, even if Mr. Kelsey could demonstrate that the performance of Attorneys Koffsky and Felsen was objectively deficient, his ineffective assistance of counsel claim would still fail Strickland's second prong: prejudice.  Assuming, arguendo, Attorneys Koffsky and Felsen had introduced Mr. Kelsey's underlying medical records from Butner and testimony from Dr. Zhong at the competency hearing on April 30, 2018, the court still would have determined that the government satisfied its burden of demonstrating that Mr. Kelsey was competent under the two-prong Dusky test.  Put differently, neither the records from Butner nor Dr. Zhong's testimony undermine the court's confidence in in the outcome of his trial and competency determination.

In reaching a competency determination, a district court "may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment."  Nichols, 56 F.3d at 411.  In this case, the court remembers Mr. Kelsey and his demeanor well.  Weighing the Reports and testimony of both doctors, the medical opinion of Dr. Marquez better aligns with the court's own recollection of Mr. Kelsey's behavior.  In particular, the undersigned strongly agrees—and agreed in April 2018—that:

> [Mr. Kelsey's] primary barrier to rationally understanding his case [was] his own willingness to listen to and integrate information from others.  This struggle appear[ed] more related to criminal-oriented cognitive errors, rather than manic or psychotic processes.  His ability to work with his lawyer remain[ed] similarly within his purview of control.  His lack of cooperation [was] rooted in his belief that he knows best for his case and his dissatisfaction with his lawyers not heeding his demands.

Dr. Marquez Report at 14–15.  Dr. Marquez's conclusion that Mr. Kelsey's primary barrier was his lack of "willingness to listen to and integrate information"—rather than incompetence—fully conforms with the undersigned's view of Mr. Kelsey, borne out of extensive observations and interactions in court.

The court's view, beyond its own memory of Mr. Kelsey's comportment, is also shaped by a few key insights made by the doctors.  First, Dr. Zhong's Report notes that Mr. Kelsey's formal cognitive examination, performance on attention and concentration tasks, and abstract reasoning and social awareness were all average.  Dr. Zhong's 2017 Report at 10.  Indeed, Dr. Zhong reported that Mr. Kelsey's "thought process was generally linear and organized[,]" but became "illogical and perseverative when discussing his legal case."  Id. at 9.  This suggests that what Dr. Zhong refers to as Mr. Kelsey's "delusional beliefs", id., are limited only to his experience with the criminal legal system.  On this point, the court was persuaded by Dr. Marquez's explanation that this subject matter-specific occurrence was more likely the result of a criminal-thinking error, rather than a set of delusional beliefs manifesting in only one area of Mr. Kelsey's life. 6/14/23 Hr'g Tr. at 55:20–57:17; see also 6/14/23 Hr'g Tr. at 130:6–130:8 (testifying at the evidentiary hearing, Dr. Zhong opined that, if someone's symptoms "were truly isolated to a single topic, then you would -- that would likely not be consistent with bipolar disorder").

Second, the court was struck by Dr. Marquez's description of a manic episode as occurring "most of the day nearly every day for at least a week and it's so intense that it is interfering with that person's ability to function daily in their environment."  5/18/23 Hr'g Tr. at 133:22–133:25; see also 6/14/23 Hr'g Tr. at 129:9–130:8 (testifying at the

evidentiary hearing, Dr. Zhong noted that someone experiencing the cluster of symptoms leading to a manic or depressive episode needs to experience those symptoms "more than half the time" for a week or so).  This not only put Mr. Kelsey's short outbursts in perspective, but it also highlighted the value of the length of Dr. Marquez's evaluation.  Dr. Zhong met with Mr. Kelsey twice—for "2.5 and 1 hour" respectively, Dr. Zhong's 2017 Report at 1—and observed Mr. Kelsey in court.  Id. However, as Dr. Zhong himself conceded, BOP "had Mr. Kelsey in custody for four months in a situation where they could observe him 24-7."  6/14/23 Hr'g Tr. at 179:3– 179:5.  That four-month span not only allowed Dr. Marquez and BOP staff to monitor closely Mr. Kelsey's behavior, but it also afforded them the chance to compare Mr. Kelsey's behavior then to how he presented during his hospitalizations in 2008 and 2011.  6/14/23 Hr'g Tr. at 33:24–34:3.  Ultimately, as Dr. Marquez concluded—and this court agrees—the two "just did not line[ up]."  Id. at 34:3.

Based on the court's own assessment of Mr. Kelsey's behavior and its agreement with Dr. Marquez's medical opinion, the court cannot find a basis for a reasonable probability that, but for counsel's (assumed, arguendo) professional errors, the result of the court's competency determination would have been different.  Even if Mr. Kelsey had demonstrated that Attorneys Koffsky and Felsen's performance was objectively unreasonable, which the court does not find, he nonetheless fails to show the second prong of Strickland.  See Strickland, 466 U.S. at 694 (holding that, to show actual prejudice due to ineffective assistance of counsel, a defendant must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

40

For all these reasons, Mr. Kelsey has failed to demonstrate deficient performance and prejudice stemming from the failure of Attorneys Koffsky and Felsen to investigate Dr. Marquez's Report or challenge the court's competency determination. Accordingly, his Motion is denied on this ground.

      B.    <u>Failure to Review Evidence with Mr. Kelsey</u>

Mr. Kelsey also maintains that Attorneys Koffsky and Felsen were ineffective because they failed to review evidence with him before trial.  <u>See</u> Pet'r's Mem. at 28; Pet'r's Reply at 3 n.2.  The ABA recognizes that, as early as practicable, a defense attorney should "share with the client evidentiary materials relevant to the matter (consistent with the terms of any applicable protective order), and determine in depth the client's view of the facts and other relevant facts known to the client."  ABA Criminal Justice Standards for the Defense Function § 4-3.3(c)(i).

Even assuming, <u>arguendo</u>, that Mr. Kelsey had established deficient performance, his ineffective assistance claim on this basis fails for lack of prejudice. <u>See</u> <u>Strickland</u>, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  Mr. Kelsey offers no argument as to how counsel's alleged failure to review evidence with him impacted his trial.  Mr. Kelsey does not assert—let alone demonstrate—that he would have elected to plead guilty rather than proceed to trial had he reviewed discovery with Attorneys Koffsky and Felsen.  Nor does Mr. Kelsey posit that he would have mounted another defense or objected to the admission of any particular evidence.  Thus, Mr. Kelsey has not shown how Attorneys Koffsky and Felsen's alleged deficiencies prejudiced him.

Accordingly, Mr. Kelsey's ineffective assistance claim that trial counsel failed to review discovery with him is denied as well.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Kelsey's Amended Motion to Vacate, Set Aside, or Correct the Sentence (Doc. No. 30) is denied.

Although Mr. Kelsey's claims fail on the merits, the court determines that he is entitled to a certificate of appealability, as "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner." Welch v. United States, 578 U.S. 120, 137 (2016) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

Additionally, the court grants the Motion to Seal CJA Time Records (Doc. No. 50).

**SO ORDERED.**

Dated at New Haven, Connecticut this 13th day of December 2023.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

42